No. 48,793

DONALD GOLDEN, *Appellee,* v. CITY OF OVERLAND PARK, KANSAS, *Appellant.*

(584 P.2d 130)

Opinion filed September 6, 1978.

*Helen Mountford,* assistant city attorney, argued the cause, and *Phillip H. Schuley,* assistant city attorney, was with her on the brief for the appellant.

*Robert J. Campbell,* of Brown, Koralchik & Fingersh, of Kansas City, Missouri, argued the cause, and *Ray L. Borth,* of Ballweg, Borth & Wilson, of Prairie Village, was with him on the brief for the appellee.

The opinion of the court was delivered by

MILLER, J.: This case comes before us on a petition for review of an unpublished opinion of the Court of Appeals. The plaintiff, Donald Golden, commenced this action against the City of Overland Park, challenging the reasonableness of the city's refusal to rezone his property from C-O (office building) to CP-1 (planned retail). The trial court, after numerous hearings and after twice referring the matter back to the city, ruled that the city's denial of rezoning was unreasonable, and ordered the city to

grant the requested zoning change. The city appealed and the Court of Appeals reversed.

The property involved is a tract of about 2.3 acres situated at the southeast corner of the intersection of 87th Street and Metcalf in Overland Park, Kansas. Golden purchased the property for $100,000 in February, 1966. The property was then zoned C-O (office building).

Shortly after he acquired the tract, Golden commenced plans to build an office building on the property. He hired an architect, and the architect's drawing of the proposed building was published in the Kansas City Star on June 12, 1966. Thereafter, various changes were made in the plans, various studies were made, and the plaintiff actively sought to secure tenants for the planned building. He was unable to secure sufficient lease commitments, and for this reason he was unable to secure the necessary financing.

In 1972 plaintiff was approached by a firm desiring to build a car wash on the property. He negotiated a lease with the car wash firm, subject to securing a zoning change to permit that use. Application was then filed to change the zoning; the lease commitment expired before the request for zoning was heard; the matter was then dropped, and the zoning change was denied.

In 1974 plaintiff was approached by the Dubois Company, which was interested in building a small shopping center on the property. Dubois planned to sublet to the Tandy Company subsidiaries, Tandy Leather, Radio Shack, Color Tile, American Handicraft, etc. A purchase option, contingent upon rezoning, was entered into. Color Tile was the only committed sublessee. An architect was engaged, and a petition for a zoning change was filed with the City of Overland Park. The requested change was recommended for approval by the planning commission's professional staff, but on August 12, 1974, the planning commission denied rezoning. The reasons stated for denial were that the original purpose was to preserve this area as a transition zone; increased traffic problems, particularly at night and on weekends, would be generated from a shopping center; and due to the aesthetics of the development and the effect on the surrounding neighborhood, increased pressure for zoning changes for other nearby areas could be anticipated.

Various changes were then made in the plans and the matter

was presented to the city commission; it tabled the matter and referred it back to the planning commission for further study.

The planning commission again recommended denial of the application. The member of the planning commission who moved for denial expressed concern that carpet sale signs could be hung up after six months "that aesthetically don't seem to be the transitional item that we anticipated here between the developments to the south and the north."

Thereafter, the city council upheld the planning commission's recommendation and denied rezoning. The only discussion on the motion was that the architect's rendering was not a true portrayal of how the proposed building would appear, since the rendering portrayed no traffic, very few parked cars, no traffic lights, utility poles or street lights, and the plantings appeared too mature.

At each of the planning commission and city commission meetings, homeowners who lived north and east of the property appeared in opposition to the proposal. Primarily, they expressed concern over traffic congestion and increased litter and noise, problems which had arisen in connection with a small shopping area on 83rd Street, where there were convenience stores (open all night) and fast food establishments. These fears were also voiced by members of both bodies.

Metcalf, for some 10 blocks south of plaintiff's tract, is primarily commercial. Immediately south of plaintiff is a tract zoned C-2, a more commercial classification than that sought by plaintiff, on which is situated an automobile dealership, where new and used motor vehicles are sold and serviced. East of and adjoining both plaintiff and the auto dealership are two-story apartments. North of plaintiff's property, at the northeast corner of 87th and Metcalf, is a tract zoned C-1, on which is situated a savings and loan. To the east and north of the savings and loan are single-family dwellings in what is known as the White Haven addition. At the northwest corner of the intersection, and continuing both north and west, are single-family dwellings. Directly west of plaintiff's tract, on the southwest corner at 87th and Metcalf, are two-story apartments. Immediately south of these and on the west side of Metcalf is a huge development, the King Louie bowling, skating and amusement center.

Trial was held before the court on August 28, 1975. On Sep-

tember 15, 1975, the court announced its decision. It made over thirty detailed findings of fact. The court concluded that the property was zoned for a use which cannot be realized; that plaintiff's considerable efforts over a seven-year period were unsuccessful; but the court concluded that four of the factors which the city presumably based its decision upon precluded the court from finding in favor of the plaintiff. The court retained jurisdiction and continued the matter in order to give the plaintiff an opportunity to correct these four items and submit proposed changes to the city. These four items were:

"1.   Access on 87th  .  .  .   that could influence backup traffic into the intersection [of 87th and Metcalf];
"2.   A greater setback from the north side to make the entrance more attractive;
"3.   Upgrading of the landscaping; and
"4.   High aesthetics in architecture to blend in with the surrounding neighborhood with emphasis on small signs."

The matter was again presented to the city council and the application for a change was again denied, this time for two reasons: because the landowner wished to retain the west entrance on 87th Street and because the landowner would not agree that logos could not be used as a part of the restricted sign area on the buildings.

Additional evidence was then presented to the district court and on March 8, 1976, the district court announced its decision. It made additional findings of fact and recognized its limited jurisdiction, and concluded that the city was unreasonable in its denial of the use of logos for the reasons that logos are in use throughout the city of Overland Park and other shopping centers; that plaintiff agreed to make their logos small, to be included in the five per cent signage on the front of the facade; and that a corporation requesting a lease insists on the use of logos to display and advertise the named company in the building where it is doing business. With reference to the access from 87th Street, the court found that plaintiff had not met his burden to show that the requirements of the city were unreasonable; however, in view of the expense plaintiff had incurred, the court granted him an additional stay of fourteen days to determine whether or not he would accede to the decision of the city to limit access to one drive on 87th Street.

The plaintiff capitulated to the demands of the city on access, and presented his application again to the city for reconsidera-

tion. The city council again denied plaintiff's request for a zoning change. The matter was then taken up again by the trial court, additional evidence was presented, and on July 23, 1976, the court entered its final order. The court reviewed the course of the lengthy proceeding, noted that plaintiff had completely capitulated to the demands of the city concerning the four issues, including that of access; found that the property was zoned for a use which the plaintiff could not realize; that the city increased the problem by zoning the tract of land to the south for a more intensive use, or CP-2 zoning for an automobile dealership, and by zoning the property to the north C-1, for a savings and loan; that immediately to the rear of the property are garden apartments for a transitional type of zoning from residential to more intensive use; that the property on the west side and across the street is zoned for a large bowling alley; that the taxes on the property are substantial ($2,172.30 in 1974) and that plaintiff simply cannot develop the property under the present zoning classification; that the professional staff of the city made a substantial study of all factors; that plaintiff has completely agreed to all the requested changes; and that the staff made a finding that the zoning sought is proper for transitional use of the property and that it in fact will serve the latter purpose as well on the proposed zoning request as an office building classification that the city demands that Mr. Golden use the property for. The court reviewed the case law, was mindful of the limitation of courts in reviewing the discretionary orders of an administrative body, and acknowledged the presumption that the city acted fairly and reasonably. The court concluded, however, that the action of the city was unreasonable, arbitrary and capricious. The trial court then granted the relief prayed for and ordered the city to grant the requested zoning change.

The Court of Appeals correctly stated the rules for judicial review of zoning ordinances. It said:

"In reviewing the trial court's decision we bear in mind first of all the restricted role of the entire judiciary in zoning matters, as recently recapitulated in *Highway Oil, Inc. v. City of Lenexa,* 219 Kan. 129, 132, 547 P.2d 330:

" 'The rules for judicial review of municipal zoning ordinances and determinations are well established. "It must be understood that the governing body has the right to prescribe zoning, the right to change zoning and the right to refuse to change zoning" (*Arkenberg v. City of Topeka,* 197 Kan. 731, 734-735, 421 P.2d 213). The power of the district court, in reviewing zoning determinations, is

limited to determining (1) the lawfulness of the action taken, that is, whether procedures in conformity with law were employed, and (2) the reasonableness of such action. In making the second determination, the court may not substitute its judgment for that of the governing body and should not declare the action of the governing body unreasonable unless clearly compelled to do so by the evidence (*Arkenberg v. City of Topeka,* supra; *Keeney v. City of Overland Park,* 203 Kan. 389, 454 P.2d 456; *Paul v. City of Manhattan,* 212 Kan. 381, 511 P.2d 244). "There is a presumption that the governing body acted reasonably and it is incumbent upon those attacking its action to show the unreasonableness thereof", by a preponderance of the evidence (*Arkenberg v. City of Topeka,* supra, p. 735; *Creten v. Board of County Commissioners,* 204 Kan. 782, 466 P.2d 263). The mark of unreasonable action by zoning authorities is ". . . when the action is so arbitrary it can be said it was taken without regard to the benefit or harm involved to the community at large including all interested parties and was so wide of the mark its unreasonableness lies. outside the realm of fair debate" (*Gaslight Villa, Inc. v. City of Lansing,* 213 Kan. 862, Syl. ¶ 3, 518 P.2d 410).' "

"See also, *Rickard v. Fundenberger,* 1 Kan. App. 2d 222, 563 P.2d 1069.

"Secondly, we must recognize that in reviewing the trial court's decision to determine whether it observed those restrictions, an appellate court must make the same review of the zoning authority's action as did the trial court. *Gaslight Villa, Inc. v. City of Lansing,* 213 Kan. 862, 518 P.2d 410, and cases cited therein; *Hukle v. City of Kansas City,* 212 Kan. 627, 512 P.2d 457; *Rickard v. Fundenberger,* supra. That is because the ultimate question, whether the action of the zoning body was 'reasonable' or not, is one of law and not of fact; otherwise the courts would have no business at all reviewing an essentially legislative determination such as zoning. See *e.g., Paul v. City of Manhattan,* 212 Kan. 381, 389-90, 511 P.2d 244. Hence a court is not free to make findings of fact independent of those explicitly or implicitly found by the city governing body, but is limited to determining whether facts could reasonably have been found by the zoning body to justify its decision.

"Put another way, courts do not weigh the evidence before the city, and if the question is fairly debatable, 'the court may not substitute its judgment for that of the city in order to change the decision on the debate.' (*Arkenberg v. City of Topeka,* 197 Kan. 731, 738, 421 P.2d 213.)"

What has troubled trial and appellate courts alike is: What is "fairly debatable" and what is "reasonable"?

Where the great bulk of the evidence supports a proposed finding, is it "fairly debatable" because there is *some* evidence to the contrary? Any proposed change for a more intensive land use can easily be described as "likely to have a domino effect," "against the public interest," or as a possible cause of "traffic problems." Any commercial establishment could be described as a producer of "noise," "litter," and "traffic." We pause to note that the intersection in question is not an isolated residential crossroad; according to the record before us, over 32,900 vehicles passed through that intersection on the average day in 1974.

The governing body, as well as the planning commission, in the several determinations by those bodies, failed to set forth or specify the factors which either considered in arriving at a decision. Individual members of the city council, testifying months later, sought to then state the reasons for their individual votes.

A city, in enacting a general zoning ordinance, or a planning commission, in exercising its primary and principal function under K.S.A. 12-704 in adopting and in annually reviewing a comprehensive plan for development of a city, is exercising strictly legislative functions. When, however, the focus shifts from the entire city to one specific tract of land for which a zoning change is urged, the function becomes more quasi-judicial than legislative. While policy is involved, such a proceeding requires a weighing of the evidence, a balancing of the equities, an application of rules, regulations and ordinances to facts, and a resolution of specific issues. *Kropf v. City of Sterling Heights,* 391 Mich. 139, 215 N.W.2d 179 (1974); *Fleming v. City of Tacoma,* 81 Wash. 2d 292, 502 P.2d 327 (1972); *Fasano v. Washington Co. Comm.,* 264 Ore. 574, 507 P.2d 23 (1973); and see *Zoning Amendments—The Product of Judicial or Quasi-Judicial Action,* 33 Ohio State Law Journal 130 (1972).

A mere yes or no vote upon a motion to grant or deny leaves a reviewing court, be it trial or appellate, in a quandary as to why or on what basis the board took its action. A board, council or commission, in denying or granting a specific zoning change, should enter a written order, summarizing the evidence before it and stating the factors which it considered in arriving at its determination. The trial court here assumed from the record before it that the city fathers considered and based their initial rejection of the zoning change on four matters—access to 87th Street, setback of building from the north side, landscaping, and architecture and signage. If in fact the city was basing its rejection upon other factors, it was incumbent upon the city to disclose those factors upon the record, while the matter was yet before the city council, or, after the matter was raised in the trial court's initial order, while the matter was before the trial court.

Those four factors are specific ones applicable to the property at hand. But what factors, generally, should a zoning body consider in hearing a request for change? The trial court enumerated six factors to be considered in determining whether a zoning

ordinance is invalid because it precludes all reasonable use of the subject property. These factors are ones which it would be well for a zoning body to bear in mind when hearing requests for change. They are:

(1)  The character of the neighborhood;

(2)  the zoning and uses of properties nearby;

(3)  the suitability of the subject property for the uses to which it has been restricted; .

(4)  the extent to which removal of the restrictions will detrimentally affect nearby property;

(5)  the length of time the subject property has remained vacant as zoned; and

(6)  the relative gain to the public health, safety, and welfare by the destruction of the value of plaintiff's property as compared to the hardship imposed upon the individual landowner.

To these we would add a consideration of the recommendations of permanent or professional staff, and the conformance of the requested change to the adopted or recognized master plan being utilized by the city. Master or comprehensive plans for the development of both cities and counties are authorized by the legislature, K.S.A. 12-704, K.S.A. 19-2916a. The legislature has stressed the making of such plans, and we believe they should not be overlooked when changes in zoning are under consideration.

As to additional factors to be considered in county planning, see K.S.A. 19-2916a where the legislature has enumerated the factors it considers important in the formulation of comprehensive plans for county development. Also, the legislature has listed in K.S.A. 12-715 the important factors to be considered by a board of zoning appeals, when considering variances from or exceptions to zoning ordinances. Conditions to be met by the applicant are enumerated in the latter statute.

Important factors to be considered in determining the validity of zoning ordinances are set forth by the Supreme Court of Illinois in the case of *La Salle Nat. Bank v. County of Cook,* 12 Ill. 2d 40, 145 N.E.2d 65 (1957), where that court said:

"Even though the validity of each zoning ordinance must be determined on its own facts and circumstances . . . yet an examination of numerous cases discloses that among the facts which may be taken into consideration in determining validity of an ordinance are the following: (1) The existing uses and zoning of nearby property . . . (2) the extent to which property values are

diminished by the particular zoning restrictions . . . (3) the extent to which the destruction of property values of plaintiff promotes the health, safety, morals or general welfare of the public . . . (4) the relative gain to the public as compared to the hardship imposed upon the individual property owner . . . (5) the suitability of the subject property for the zoned purposes . . . (6) the length of time the property has been vacant as zoned considered in the context of land development in the area in the vicinity of the subject property. . . .

   . . . . . . . . . . . . . . .

  "No one factor is controlling. It is not the mere loss in value alone that is significant, but the fact that the public welfare does not require the restriction and resulting loss. When it is shown that no reasonable basis of public welfare requires the limitation or restriction and resulting loss, the ordinance fails and the presumption of validity is dissipated. . . . The law does not require that the subject property be totally unsuitable for the purpose classified but it is sufficient that a substantial decrease in value results from a classification bearing no substantial relation to the public welfare." (pp. 46-48.)

These factors were again cited with approval in *La Salle Nat. Bk. v. City of Evanston,* 57 Ill. 2d 415, 312 N.E.2d 625 (1974) and *Smith v. City of Macomb,* 40 Ill. App. 3d 658, 352 N.E.2d 697, 703 (1976).

The factors designated by the Illinois court are similar to the factors listed by the trial judge in the case at hand. We have listed all of these various factors here not as the exclusive factors to be considered in each zoning matter, but as suggested factors which may be important. Other factors may and no doubt will be of importance in the individual case.

Reasonableness remains the standard for review. K.S.A. 12-712; K.S.A. 19-2913. However, that standard will be more readily, more effectively, and more uniformly applied if zoning bodies will place in their minutes a written order delineating the evidence and the factors the board considered in arriving at its conclusion. Reviewing courts, then, will have a record to review and to act upon.

As the Court of Appeals noted, the critical finding of the trial court was that the plaintiff was unable to make any economically feasible use of his property under the existing zoning. Some of the members of the city council reasoned that 1,700,000 square feet of office space had been built in Overland Park during the years that plaintiff owned the property without developing it. Any dilemma now faced by the plaintiff at the present time, they reasoned, he brought upon himself by not having lowered his sights and having attempted to place upon his property a more

modest office facility than the multi-story office building which he originally envisioned. This view, it seems to us, ignores the finding of the trial court, supported by an abundance of evidence, that at the time of trial there were many vacant office buildings in Overland Park, with a present overbuild in the Overland Park area; that there was a lack of money from mortgage bankers for office development; and that plaintiff's property was not attractive for office development. These findings relate to the situation at the time the application for rezoning was presented. The issue is whether zoning for office construction was appropriate at the time of the hearing, not at some earlier date in Overland Park's history. *Paul v. City of Manhattan,* supra. A massive overbuild of office space, whether in large office buildings or in small, leads to the inevitable conclusion that the demand for additional office space did not exist in Overland Park in 1974.

Plaintiff sought to establish a small shopping center for retail shops which would not be open on Sundays. Apparently the city places convenience stores and fast-food service shops under the same classification—CP-1—as it places all retail establishments. Such broad classifications are not the fault of the landowner. The protests of neighborhood residents, voiced at planning commission and council meetings, were for the most part against the establishment of convenience stores or fast-food shops—neither of which were proposed by the plaintiff. Protests, of course, may be considered; but protests against uses not proposed are not entitled to great weight, as the trial court held.

The trial court carefully considered each of the factors it enumerated. When it found that the city was reasonable in some of its objections to the requested change, it denied plaintiff relief but granted him an opportunity to conform to the changes requested by the city. Upon his conformance, the city remained adamant and refused the change. At that point, after weighing the evidence and all of the applicable factors, the trial court concluded that the plaintiff could not utilize his property for the purposes for which it was zoned. The court correctly found that the apartment complexes to the east and west of plaintiff's land serve as transitional zoning between the single family residential areas and the more intensive commercial zoning. Reluctantly, the trial court found the city's denial of the requested change unreasonable, and ordered the change from C-O to CP-1 zoning. The

finding of unreasonableness by the trial court is amply supported by the evidence.

The judgment of the Court of Appeals is reversed, and that of the trial court is affirmed.

FROMME, J., dissenting. This action in the district court is authorized by K.S.A. 12-712 and the scope and nature of the review is limited thereby. Under the statute the district court is given the authority to review the action of a municipality in a zoning matter. Any person having an interest in property affected may have the reasonableness of any ordinance or regulation determined in such an action. If the ordinance or regulation by the municipality is found to be unreasonable the ordinance or regulation may be set aside. The statute does not authorize a district court to substitute its judgment for that of the municipality. The court is not authorized to enter the business of zoning. The court merely determines if the ordinance or regulation is reasonable. The Kansas cases which support these statements were recognized by the Court of Appeals and applied. These cases are set forth in the majority opinion and recognized as the law.

However, after paying lip service to these cases the majority disregards the principles cited and adopts a new approach to judicial review in zoning actions. A novel bifurcation of the scope and nature of review under K.S.A. 12-712 is initiated. The opinion of the court states that when a city adopts "a comprehensive plan for development of a city" it acts in a legislative capacity. (Syl. ¶ 1.) In such a case review by the courts under the statute is limited as recognized in our previous case law. On the other hand, when a city is called on to rezone "a particular tract" the action of the municipality becomes "more quasi-judicial than legislative." (Syl. ¶ 2.)

The request for rezoning in the present case relates to a particular tract, so under this new law judicially declared by the majority the refusal to rezone this tract becomes more quasi-judicial than legislative, whatever that means.

Now let us consider the procedure followed by the district court in this case, which procedure is approved by the majority as being within the proper scope of review provided by K.S.A. 12-712. The district court heard the evidence and made over thirty findings of fact. It then concluded that four factors pre-

cluded it from finding the city had acted unreasonably in denying the requested zoning change. In other words, the court found the action of the municipality in refusing to rezone the property was reasonable.

Under our prior case law this should complete the review contemplated by K.S.A. 12-712 and the refusal to rezone should have been approved by the district court. In the present case the district court retained jurisdiction of the case and gave the plaintiff-landowner an opportunity to take care of the four changes in planning which the court required. These "proposed changes" were to be agreed to by the landowner and then the new plan was to be resubmitted to the city for a final decision by that body. These four planning changes were:

"1.  Access on 87th  .  .  .  that could influence backup traffic into the intersection [of 87th and Metcalf];

"2.  A greater setback from the north side to make the entrance more attractive;

"3.  Upgrading of the landscaping; and

"4.  High aesthetics in architecture to blend in with the surrounding neighborhood with emphasis on small signs."

It should be noted that these were all matters bearing upon plans for a proposed shopping center. This action by the court presupposes the property should no longer be zoned C-O (office building) and should be rezoned CP-1 (planned retail). At this stage of the proceedings the district court entered into the business of zoning.

Apparently, two of the four suggested changes in planning the shopping center were rejected by the plaintiff-landowner. The plan with two changes was then presented to the city council. The application for rezoning was again denied by the city. Thereupon the district court resumed jurisdiction over the rezoning application in court and held another hearing. Additional evidence was introduced, and the court then ordered the zoning change.

The majority approves this procedure, the effect of which is to give the district courts of this state complete and final control of the rezoning process. Hereafter, when a rezoning action by a municipality is considered "more quasi-judicial than legislative" the district court in reviewing the action taken by the municipality not only will hear evidence and make findings but also will order planning changes and control the nature of the facility to be constructed.

Such authority is beyond that contemplated and granted by the

legislature. It violates the separation of powers doctrine encompassed by the constitution. I would affirm the Court of Appeals and reverse the trial court.